UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>　　　　　v.　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>CHRISTOPHER GIL　　　　　　　)<br>　　　　　Defendant.　　　　　　 ) | Case No.: 1:25-CR-110-AMN<br>Honorable Anne M. Nardacci<br>U.S. District Court Judge |

**DEFENDANTS SENTENCING MEMORANDUM AND MOTION FOR A DOWNWAD DEPARTURE OR VARIANCE**

**Introduction**

Christopher Gil stands before this court for sentencing subsequent to his April 9, 2025, plea of guilty to one count of conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 §§ 846 and 841(a)(1).Chris was initially charged via criminal complaint on March 1, 2024 and made his initial appearance before Magistrate Judge Daniel J. Stewart on October 22, 2024. Christopher waived his right to a detention hearing. Subsequently Mr. Gil waived his right to indictment, accepted responsibility, and pleaded guilty to the one count information herein.

**The Factors to be Considered in Imposing Sentence**

Congress has set forth specific factors the court should consider before imposing a sentence. Title 18 U.S.C. § 3553 (a) directs the court to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense.

(B) To afford adequate deterrence to criminal conduct.

(C) To protect the public from further crimes of the defendant; and

    (D) To provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner. *See*, 18 U.S.C. § 3553 (a) (2).

To create such a "sufficient, but not greater than necessary sentence", the court must consider the nature and circumstances of the offense; the history and characteristics of the offender; the kinds of sentence available and the sentencing range established by the guidelines. *See*, 18 U.S.C. § 3553 (a) (1), (3), (4).

## The Nature and Circumstances of the Offense

Mr. Gil made controlled sales of methamphetamine pills to a confidential source on four occasions from February 2024 and September 2024. The total weight of the pills sold was 813 grams. The parties agree Chris is responsible for between 500 grams and 1.5 kilograms of methamphetamine pills. Drug tests completed by the government [attached here as Exhibit "A"] indicate the percentage of methamphetamine contained within the pills was less than five percent of the total pill weight. Two tests were conducted, one which produced a substance purity of 3.7% and one that produced a substance purity of 2.1%. The actual amount of methamphetamine within the pills was likely closer to 30 grams based on the purity established by the Government.

## The History and Characteristics of the Offender

A full recitation of Mr. Gil's history and characteristics is provided in the mitigation report provided by Dr. Elizabeth Walker, DSW, LICSW, attached here as Exhibit "B". The key factors the Court should consider in determining what the appropriate sentence for Mr. Gil is in light of the 18 U.S.C. § 3553(a) factors are highlighted here:

Mr. Gil was born on February 24, 1977 to Theresa Gil, who was 18-years old at the time. Mr. Gil's father was a travelling carnival worker whom Christopher never met. Born in Albany,

Chris's mother relocated to New Paltz, New York to pursue her bachelor's and master's degrees. While his mother attended college Christopher lived between his mother's home in New Paltz and his grandparents' home in Albany. Ultimately, his mother completed a Ph.D. She was a capable student, and education was highly valued in the Gil family. When Chris was 15 years old, his mother's longtime boyfriend, Rolf Haerem, moved into the Gil family home. Mr. Haerem was a successful working artist, an intellectual, much like Mr. Gil's mother. The presence of a father figure had a calming effect on Chris and the two built a meaningful relationship that persists to this day.

  Sadly, Mr. Gil is dyslexic. In the 1980s he had virtually no support in school to address this disability. He struggled and hated school, never being able to follow along and feeling punished by the teachers. The chasm between his young mother's educational success and Chris's absolute struggles educationally could not be rectified. Christopher attended intensive literacy instruction programs structured within summer camps three separate times. He was successful in those programs, but that accomplishment did not translate to traditional academic success.

  Difficulty in school prompted the school district to recommend Chris take Ritalin to control his attention without addressing his dyslexia in any meaningful way. Chris hated taking the stimulant, it made him feel flat and not like himself. The end result was not optimal. Mr. Gil dropped out of high school at age sixteen.

  After leaving school Chris went to a series of residential drug treatment programs in his teens. When the treatments programs were not successful, Mr. Gil was admitted to the Four Winds psychiatric hospital where he was treated for depression.

  Mr. Gil's youth was characterized by dichotomies – living in a family of intellectuals he was the red herring. He gravitated to the margins, where he felt like he fit in, while simultaneously

displaying emotional intelligence not typically associated with children who drop out of school and end up in rehab. For example, when he was 14 years old, Mr. Gil invited a friend for a sleepover. The friend admitted he was nervous to stay because he had a bed wetting problem. Rather than take this as an opportunity to make fun of his friend, Chris embraced the situation, encouraged the boy to stay, and even woke him multiple times throughout the night to encourage him to go to the bathroom. In a situation where bullying could have been expected, Chris instead fully accepted his friend's challenge.

Chris suffered a life altering injury in 1999. Chris had moved from his mother's home to his first apartment that year. A fight on Thanksgiving Day with a roommate over rent money ended with the roommate stabbing Chris in the leg. The emergency room doctor missed a deeper cut to an artery when he stitched Mr. Gil's wound and Mr. Gil developed a severe compression syndrome that necessitated multiple weeks in the hospital, multiple surgeries, and a skin graft. It left his leg both significantly disfigured and a constant source of pain- he receives disability support because of this injury and the lasting damage. Mr. Gil's injury and subsequent rehab played a disruptive role in his early adulthood and facilitated a protracted struggle with depression and substance abuse.

After he recovered enough from his injury to walk, Mr. Gil fell in love and tried to build a new life in Florida. This too was a double-edged sword. It seemed everyone carried weapons, and the substance abuse scene freighted him. Opioids were everywhere. He knew multiple people who overdosed and died. What has become a sad theme in Mr. Gil's life, his relocation to Florida began on positive notes and ended in disaster when he was shot in the torso and in the hand during a robbery. The shooting cost him half a finger.

Struggling with minimal education, long-term injuries, victimization at the hands of violent crime, and of course the dyslexia that had plagued him since he was a boy, Mr. Gil returned to New York State. He struggled to find a professional path in life. Mr. Gil worked in customer service, food service, and as a laborer. He completed training in audio engineering and earned a Commercial Drivers License. In a family where education is the most important indicator of success, Mr. Gil's own academic struggles and lackluster professional life have always been a source of shame that he must navigate to stay close to his family.

Mr. Gil found himself in another life altering situation in 2013. This time, of his own doing. After years of petit legal trouble, he was prosecuted and convicted of Criminal Possession of a Controlled Substance with Intent to Sell 3rd degree. He completed the Department of Corrections and Community Supervision's (DOCCS) Shock Program. Due to his leg injury and the physically rigorous nature of the program he restarted the program three times due to missing too many days while sequestered in the sick bay on IV antibiotics fighting infection.  His six-month bid grew to nearly 12 months; he did not want to quit Shock, he states, "I just became like obsessed with getting through it."  Following Mr. Gil's state conviction and subsequent Shock Program completion he made significant strides, remaining arrest free and sober for many years, while meaningfully contributing within his family to help his grandmother. True signs of growth on his part.

In 2019, when again in rough patch following his grandmother's death, Mr. Gil's friend suggested he seek medical intervention. As luck would have it, he was connected with Danielle Simonson, whom this Court is well familiar with [1:23-cr-238 (AMN)].  Mr. Gil sadly became another victim of Ms. Simonson, who prescribed him Adderall among other things at rates that rapidly exceeded FDA recommendations and appear to have no medical basis. Dr. Walker's Mitigation report [Exhibit "B"] details the significant overprescribing Mr. Gil was subjected to at

pages 3-6. Ultimately Mr. Gil took, at what he believed to be a medical professional's proper advice, 90 mg of Adderall daily. This dosage is more than double the FDA's recommended maximum [See Exhibit "B" at pages 3-4, see also Mr. Gil's medical prescription history, attached as Exhibit "C"].

When Ms. Simonson was ultimately prosecuted for her own criminal behavior, Chris was left horribly dependent on the medication she had over prescribed him. He was referred to another treatment provider, Ms. Anja Salamack, who is, sadly, also known to this Court [1:25-cr-234 (AMN)]. Again, he failed to receive meaningful treatment and instead was subjected to dishonest pill pushing. When Ms. Salamack's own legal troubles heated up, Chris was again left without a medical provider, and his hand was forced. It may be easy to write off this link between Mr. Gil, with his prior felony conviction, and these two unethical and criminal medical professionals, but we must remember the context of the situation and Mr. Gil's history and characteristics. Prior to being connected with Ms. Simonson, he remained arrest and drug free for years. During a challenging time while grieving his grandmother's death, he believed he was being connected with proper medical professionals. Mr. Gil is not highly educated, he is not sophisticated, and he, sadly, is not immediately one to turn to his capable family members for help, out of the shame he still feels for the stark contrast between the stereotypical successful lives they have lived and his own divergent path. He was in virtually every way, a perfect type of victim for Ms. Simonson and then Ms. Salamack to pray on.

The true harm caused by Ms. Simsonson and Ms. Salamack is made abundantly clear in the context of Mr. Gil's case – after two failed runs at obtaining what he perceived to be honest medical care; he elected to take things into his own hands. He decided to purchase pills on the internet driven black market. Realizing he could not buy them in small quantities, he bought them

in a volume that facilitated his future sales. Mr. Gil fully acknowledges the criminal nature of his conduct and accepts responsibility for his actions. Simultaneously, the story of how he got to this point in his life is much more complex than the common low level methamphetamine dealer. It warrants a significant downward variance from the guideline calculation.

## The Guideline Calculation

*Offense Level*

Christopher's base offense level is 30 pursuant to U.S.S.G. § 2D1.1. Acceptance of responsibility credit results in a total of three level reduction of his offense per U.S.S.G §3E1.1. The net offense level should be scored as 27.

*Criminal History Score*

The defense adopts Probations calculations that Mr. Gil scores three criminal history point and therefore falls into Criminal History category II.

*Guideline Calculation*

The presumptive guideline calculation is 78-97 months.

## Sufficient but Not Greater than Necessary Sentence

*The Court should vary from the Sentencing Guidelines because the guideline here fails to consider the §3553(a) factors.*

The defense acknowledges the Sentencing Commission expressly contemplated actual methamphetamine and pill form methamphetamine and provided a specific offense level and commentary in USSG § 2D.1.1 regarding the application of the guidelines for pill for methamphetamine. The defense would submit that the treatment of pill form methamphetamine under § 2D1.1 is an instance where the Sentencing Commission failed to construct a sentencing structure that complies with the 18 USC § 3553(a) factors. Otherwise similarly situated defendants who possess pill form methamphetamine rather than pure methamphetamine are routinely

penalized at a higher offense level for possessing what amounts to the same amount of methamphetamine than those defendants charged with pure methamphetamine.

The drug quantity table within § 2D1.1 presumes pill form methamphetamine has a composition that is 10% pure. At the offense level that applies to Mr. Gil, for example, 50 grams to 150 grams of pure methamphetamine and 500 grams to 1,500 grams of pill form methamphetamine are treated as the same for purposes of calculating an offense level. The Sentencing Commission seems to have presumed that 500 grams of pill form methamphetamine was the equivalent of 50 grams of pure methamphetamine. That presumption is mislaid.

Here – two drug tests verified purity levels of the pills Christopher sold at 2.1% and 3.7% purity. Even applying the higher of the two test results to the entire weight at issue here [812 grams of pills] the actual amount of methamphetamine within the pills equals 30.04 grams. That amount of methamphetamine, if pure methamphetamine, is assigned an offense level of 26 in the drug quantity table. It is simply illogical that 30 grams of highly diluted methamphetamine contained within hundreds of pills would trigger a higher offense level than possessing 30 grams of pure methamphetamine. It is clear which substance is actually more dangerous - it is not the pills. The Sentencing Guidelines even expressly contemplate that more pure forms of controlled substances indicate more serious conduct - § 2D1.1 note 27(C) recommends an upward departure when drugs trafficked are an unusually high purity. Here, the drugs trafficked were an extraordinarily low purity (mathematically, if they were any significant amount lower, they would not be a controlled substance!) yet the operation of the drug quantity table treats 812 grams of pills containing only 30 grams of methamphetamine much more harshly than the same amount of pure methamphetamine. It makes no sense to punish 3% pure counterfeit Adderall pills more harshly than the same amount of actual pure methamphetamine would trigger.

Because of this error in the chart's logic, a defendant like Mr. Gil, with a criminal history category of II, convicted of possessing 30 grams of pure methamphetamine rather than 30 grams of methamphetamine diluted within hundreds of pills, would have a projected guideline sentence potentially as much as three years lower than Mr. Gil's presumptively correct guideline for possessing the pills at issue.[1]

Judicial Sentencing Information for the most recent five-year period indicates that defendants sentenced for possessing pill form methamphetamine, with an offense level of 27 and criminal history category of II is 59 months. The median length of the sentence is 60 months. Clearly, Courts have identified the incongruity in the drug quantity table that creates an exaggerated sentencing guideline for pill form methamphetamine and vary downward in a way that acknowledges the need to not penalize defendants unreasonably because they possessed unpure pill form methamphetamine rather than a similar amount of actual methamphetamine. It is certainly not a coincidence that the actual average sentence for a defendant in Mr. Gil's position falls within the guideline range of defendants receiving the beneficial lower offense level assigned to the same weight pure methamphetamine would receive.

Mr. Gil is in an uncommon position, however, in which even the actual average sentence similarly situated defendants receive would not be justified for him when considering the § 3553(a) factors. Mr. Gil is simply not similarly situated to likely, any defendant. He has struggled with dyslexia his whole life. He has faced grievous bodily injuries – he has been stabbed and shot resulting in permeant debilitating injuries. Most critically to the instant case, he has been victimized by drug pushing medical professionals who themselves are convicted felons facing

---

[1] Mr. Gil is presumptively criminal history category II and offense level 27 with acceptance of responsibility. This nets a guideline range of 78-97 months. The guideline for a defendant convicted of possessing the same amount of methamphetamine but in pure form (30 grams) would, after acceptance, have an offense level of 23 and a guideline range of 51-63 months.

federal sentences. This Court sentenced Danielle Simonson to seventy months in prison for drug distribution driven through the abuse of her medical license. In that case, the Government accurately characterized defendant Simonson as a "prolific drug dealer, plain and simple" and highlighted the harm caused by her conduct [Gov't Sentencing Memo, 1:23-cr-238 (AMN) Doc. No. 35, at page 3]. Mr. Gil was precisely one of the people the Government contemplated in its sentencing memo in that case. The government highlighted the extraordinary harm to victims of Ms. Simonson, stating:

> Some of these patients came to the defendant for legitimate treatment, and some suffered from serious addictions and mental health conditions. They came to the defendant seeking care and comfort, and the defendant betrayed them, her profession, and her oath. Moreover, when the DEA arrested the defendant, her patients' medical treatment was interrupted, and they each had to scramble to find another provider – which is not easy to do given the shortage of psychiatrists and other mental health professionals. [Gov't Sentencing Memo, 1:23-cr-238 (AMN) Doc. No. 35, at page 4].

Mr. Gil was one of the people impacted by Ms. Simonson's criminal conduct, and when left in the scramble to find another provider, as is all too common, he turned to the illegal drug world to continue to feed the addictive fire that had clearly been fueled by Ms. Simonson's and then Ms. Salamack's criminal behavior.

Mr. Gil takes full responsibility for his decision making and criminal activity. Simultaneously he cannot be considered to be anywhere near the same category of offender as Ms. Simonson. Given the direct link between these two different defendants, fairness in sentencing for Mr. Gil demands a significant variance down from the guideline minimum. The defense respectfully requests the Court sentence Mr. Gil to 45 months and 3 years of post-release supervision. This request is based in part on the fundamental fairness demanded by not penalizing Ms. Simonson, a prolific drug dealer, more lightly than Mr. Gil. A sentence equal to sixty-five percent of what Ms. Simonson received meets the § 3553(a) factors and serves justice here, when

every fact of Chris's life is considered and his criminal conduct is placed into the context of his extraordinarily challenging life.

## Conclusion

Mr. Gil makes no excuses for his behavior and has accepted responsibility for his actions. Based on the nature of the offense, his criminal history, personal history and characteristics as well as the average sentence length provided by the United States Sentencing commission and the unique factors in this case, I ask the Court to sentence the defendant to 45 months and 3 years of post-release supervision.

Dated: September 12, 2025

LISA PEEBLES
Federal Public Defender

By: _____
Eric K. Schillinger
*Attorney for Christopher Gil*
Assistant Federal Public Defender
Bar No.: 516083
54 State Street, Suite 310
Albany, New York 12207
(518) 436-1850
eric_schillinger@fd.org

## CERTIFICATE OF SERVICE

On the above date the sentence memorandum was filed with the court, and delivered via ECF to the following parties: AUSA Ashlyn Miranda, Esq.

Dated: September 12, 2025

                                            Eric K. Schillinger
*Attorney for Christopher Gil*
Assistant Federal Public Defender
Bar No.: 516083
54 State Street, Suite 310
Albany, New York 12207
(518) 436-1850
eric_schillinger@fd.org